Electronically Filed: July 31, 2015

**ANDERSEN LAW FIRM, LTD.**
Ryan A. Andersen, Esq.
Nevada Bar No. 12321
101 Convention Center Drive
Suite 600
Las Vegas, Nevada 89109
Email: *randersen@andersenlawlv.com*
Phone: 702-522-1992
Fax:    702-825-2824

*Proposed Counsel for Debtor*

# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF NEVADA

| In re: | Case No.: 15-14394-led |
|---|---|
| JERSEY ELECTRIC & SOLAR, | Chapter 11 |
| Debtor. | **OMNIBUS DECLARATION OF BRIAN N. GECZI IN SUPPORT OF DEBTOR'S INITIAL EMERGENCY MOTIONS AND RELATED RELIEF** |
| | Hearing Date: *OST Requested* |
| | Hearing Time: *OST Requested* |

I, Brian N. Geczi, hereby state as follows under penalty of perjury:

1. I am over the age of 18 and mentally competent.

2. I make this Declaration in support of the various motions and applications requesting certain types of immediately required relief (collectively, "Initial Motions") filed by Jersey Electric, a Nevada corporation ("Debtor"), as debtor and debtor in possession in the above-captioned bankruptcy case ("Case"), as well as such other relief as may at various times be requested in the Case.

3. I am the President of the Debtor. In this capacity I am responsible for the management of all aspects of the Debtor's business operations. I am also the sole shareholder of the Debtor. As a result, I am readily familiar with the Debtor's business, operational, and financial affairs. Except as otherwise indicated, all facts set forth herein are based on my personal knowledge of the Debtor's

operations and finances, information learned from my review of relevant documents, and information supplied to me by other members of my staff and my legal advisors. If called upon to testify regarding the contents of this Declaration, I could and would do so consistent herewith.

4. I have worked in the electrical field since 1993. I started the Debtor in 2001, and have been intimately involved in its business operations since that time.

5. This Declaration provides the Court with certain background information regarding the Debtor, provides context for the relief sought in the Initial Motions, and provides information that may be applicable to additional relief requested throughout the Case. Therefore, this Declaration is divided into two main sections: (1) an overview of the Debtor, its business and organizational structure, and the events leading to the Case; and (2) an explanation of the factual circumstances supporting the relief sought in the Initial Motions.[1] The relief sought through the Initial Motions is critical to the continuation of the Debtor's business, will ensure a smooth transition for the Debtor into its Case, and will help set the Debtor on track for a successful reorganization through bankruptcy.

### I. Background

*A. Overview*

6. The Debtor is a licensed and bonded electrical contracting company providing services to customers throughout the Las Vegas Valley and the surrounding geographic area. The services provided by the Debtor can be divided into five main categories: (i) <u>traditional electrical services</u> consisting of general and high voltage electrical wiring installation and repair, fire alarm installation and repair, and installation and repair of lighting control and automation systems, among others; (ii) <u>network and cabling services</u> consisting of Cat 5E and Cat 6 wiring installation and repair, Ethernet computer network and server room connection installation and repair, and fiber optic cable installation, termination, certification, and repair, among others; (iii) <u>solar electrical services</u> consisting of the installation, maintenance, and repair of solar energy equipment for residential and commercial users, among others; (iv) <u>access control and video surveillance systems</u> consisting of the system design,

---

[1] All capitalized terms used but not defined herein are used as defined in the relevant Initial Motions, all of which are being filed contemporaneously herewith.

integration, and installation of access control and video surveillance systems, and the repair, replacement, and maintenance of such systems, among others; and (v) <u>outdoor lighting</u> consisting of installation, maintenance, and repair of parking lot, storefront, security, and signage lights for residential and commercial users.

7. The Debtor employs approximately thirty employees and provides service to residential and commercial customers. The Debtor operates a substantial fleet of service vehicles, including bucket trucks and lift equipment required to reach difficult electrical installations. Further, the Debtor provides emergency services twenty-four hours a day, seven days a week. The Debtor performs work on everything from small, private homes to casinos located on the Las Vegas Strip.

8. Until recently, the Debtors operations produced revenue sufficient to cover its expenses, and the Debtor was able to perform services and installation on behalf of customers in a timely manner and at a price that was competitive for the customer while also being profitable for the Debtor. Unfortunately, the Debtor entered into an ill-advised business deal that torpedoed the Debtor's profitability and, that, more-recently, jeopardizes the Debtor's very existence as a going-concern business.

*B. The Solar Universe Franchise Agreement*

9. Solar Universe, a Delaware corporation ("Solar") is a franchisor of a business which, through its franchisees, provides solar photovoltaic installation for renewable energy applications, focusing primarily on the residential market.

10. On or about March 16, 2011, Solar and the Debtor entered into a written Franchise Agreement, a copy of which is attached hereto as **Exhibit 1**.

11. The Debtor began operating a franchise of Solar pursuant to the Franchise Agreement in or around May of 2011. From the beginning, the Debtor built its own customer base through its own independent marketing efforts. Solar has provided only minimal referrals to the Debtor during the life of the Franchise Agreement.

12. Throughout the time period that the Debtor attempted to work with Solar under the Franchise Agreement, Solar consistently failed to perform its obligations under the agreement, as it

repeatedly failed to provide the Debtor the support it was required to provide under the agreement. Specifically, Solar misrepresented to the Debtor the availability of financing tools available for franchisees to offer to potential customers interesting in purchasing or leasing solar generating products and failed to provide promised software that was supposed to allow the Debtor to accurately price and bid solar installation jobs. Further, Solar provided only limited assistance to the Debtor in locating and converting business leads.

13. Even more egregious, Solar repeatedly required the Debtor to train personnel from other potential franchisees and potential future competitors to its own detriment. When the Debtor voiced these concerns to Solar, they fell on deaf ears. The Debtor was not compensated for providing this training.

14. From the beginning, the projects that came to the Debtor by virtue of the Franchise Agreement were smaller residential projects that, by virtue of being smaller projects, had smaller margins and were more difficult for the Debtor to complete in a profitable fashion. As a result, the Debtor began focusing on larger, custom projects that would allow the Debtor to increase its profit margins and, thus, return to profitability in its solar operations.

15. In or around early 2014, the Debtor and Solar agreed through their respective business representatives that the Debtor had outgrown the business model provided by Solar and that it would be in the best interest of each if they mutually agreed to terminate the remaining term of the Franchise Agreement. To that end, discussions began regarding the termination of the Franchise Agreement, and the Debtor continued to establish its own independent business practices focused on what it viewed as a more profitable business model.

16. The Debtor and Solar were close to finalizing a termination agreement, and numerous written drafts of such an agreement had been exchanged, although no final agreement had been signed. Per this termination agreement, the parties agreed the Debtor would pay certain amounts to Solar that Solar claimed it was owed, and, in exchange, Solar would not attempt to enforce the purported non-compete covenants contained within the Franchise Agreement.

17.  Solar was aware the Debtor had started to take its business in a new direction. Indeed, the Debtor had installed solar systems prior to entering into the Franchise Agreement with Solar, and all parties knew it intended to continue installing such systems following any termination thereof. Upon the parties agreeing that a termination of the Franchise Agreement was appropriate, Solar stopped sending even the minimal marketing leads it had been sending prior.

18.  Despite the Debtor thinking it was close to a resolution with Solar, without any advance warning, Solar unilaterally ended all discussions regarding termination of the Franchise Agreement, and Solar followed up this unilateral termination with a purported Notice of Default in June of 2014. Following this Notice of Default, unilaterally and without any explanation, Solar began sending contact information for potential customers to the Debtor.

19.  The Debtor no longer markets itself as Solar Universe, as it did during the time it worked under the Franchise Agreement, and has taken all necessary steps to distance itself from its time working with Solar. The Debtor views its decision to enter into the Franchise Agreement with Solar, Solar's failure to honor the commitments it made under such agreement, and the expensive litigation pursued by Solar against the Debtor, discussed below, as the primary causes of the Debtor's need for bankruptcy reorganization.

*C. The Solar Universe Litigation*

20.  Solar initiated a lawsuit against the Debtor and others on August 19, 2014 by filing a complaint in the United States District Court, District of Nevada ("District Court"), Case No. 2:14-cv-01351-GMN-CWH. A copy of the Complaint, excluding exhibits thereto, is attached hereto as **Exhibit 2**.

21.  On August 29, 2014, Solar filed a motion seeking a preliminary injunction against the Debtor. The Debtor opposed this motion, and, at a hearing held on October 28, 2014, the District Court denied Solar's request for a preliminary injunction without prejudice, after finding that Solar had failed to show that confusion between the Debtor and Solar had either occurred or was likely to occur. As Solar had decided to initiate binding arbitration through the American Arbitration Association under the Franchise Agreement, the District Court stayed this case.

22. The arbitration is currently scheduled to proceed in September of this year. However, the Debtor can no longer survive the expense and distraction of the litigation brought by Solar, without mentioning the potential for a substantial adverse award being entered against it. To that end, the Debtor has determined that addressing all of its liabilities while continuing business operations through a Chapter 11 bankruptcy case is in the best interest of both the Debtor and the Debtor's creditors, employees, customers, and other parties in interest.

23. The Solar Universe Litigation has impacted the Debtor's ability to timely pay suppliers, and, just prior to filing bankruptcy, Consolidated Electrical Distributors, Inc., a former supplier, initiated suit against the Debtor in the Eighth Judicial District Court for Clark County, Nevada, Case No. A-15-721972-C. A copy of the Complaint is attached hereto as **Exhibit 3**.

*D. Current Operations and Performance*

24. While the Debtor remains a viable business, without the ability to restructure through bankruptcy, its future does not appear to be positive. The costs of litigation, to say nothing of the potential judgment and attendant interruption of business operations, threaten the Debtor's existence. Further, the uncertainty that surrounds the Solar Universe Litigation and the distraction this litigation provides to the Debtor and the Debtor's management have further destabilized the Debtor's business operations.

25. Through bankruptcy, the Debtor plans to address the Solar Universe Litigation, its past-due debts owed to suppliers, and its overall business model. By refocusing on the aspects of its business that are truly profitable and sustainable, and by shedding lines of business that are less profitable, the Debtor will be able to utilize the restructuring tools available to it under the Bankruptcy Code to effectuate a reorganization of both its business operations and its balance sheet, will be able to make payments to creditors, and, most importantly, will be able to continue servicing customers and providing paychecks to its employees.

## II. Initial Motions

### A. Introduction

26. The Debtor's transition into its Chapter 11 bankruptcy case must proceed in such a way as to continue its business operations uninterrupted. This will allow the Debtor to continue business operations in bankruptcy and allow it the opportunity to successfully reorganize. Accordingly, it is vital that the Debtor take every measure possible to maintain strong relationships with its vendors, creditors, employees, independent contractors, customers, and such other parties that enable the Debtor to conduct its business. This requires the Debtor to take certain steps to minimize disruptions that could result from the Debtor's Case.

27. I have reviewed and am generally familiar with the contents of each of the Initial Motions. Based on my personal knowledge, my familiarity with the Initial Motions, and additional information provided to me by the Debtor's staff and legal advisors, the relief sought in each of the Initial Motions is necessary to facilitate the Debtor's smooth transition into bankruptcy, to minimize disruption to business operations, and to prevent the erosion of productivity or value.

### B. Utilities

28. In the ordinary course of its business operations, the Debtor incurs utility expenses for water and sewer, electricity, telecommunications, and waste management. The utility services provided by certain utilities (as such term is used in Section 366, collectively "Utility Providers"). On average, the Debtor expends approximately $4,000.00 on utilities provided by the Utility Providers, depending on the season, with costs increasing during the summer months. As of the Petition Date, the Debtor is current on its utility obligations.

29. The utility services provided by the Utility Providers are essential to the Debtor's business operations and, thus, to its reorganization efforts. The Debtor must have uninterrupted access to the utilities, as any interruption of utility services, even for a brief period of time, would seriously interfere with the Debtor's ability to work on and complete projects on behalf of customers, thereby negatively affecting the Debtor's customer relationships, goodwill, revenues, and profits. Such an interruption would harm the Debtor's reorganization efforts and would negatively impact the Debtor's

value, ultimately harming creditor recoveries. It is therefore critical that utility services continue uninterrupted during the Debtor's Chapter 11 Case.

30. The Debtor intends to make all post-petition payments to the Utility Providers in a timely manner. The Debtor expects it will have access to funds sufficient to make these payments from its ongoing business operations, and such funds constitute unencumbered cash. Given its long and positive account history with the Utility Providers, the fact that the Debtor is current with all of its obligations to the Utility Providers, and the relatively small monthly obligations owed to the Utility Providers, the Debtor asserts there is no need to provide any additional assurance of payment for utility services for future services to the Utility Providers, including those Utility Providers that did not hold deposits from the Debtor as of the Petition Date.

*C. Payroll*

31. As of the Petition Date, the Debtor employs approximately thirty employees ("Employees") in the ordinary course of its business. The Employees were owed or had accrued in their favor various sums and wages incurred in the ordinary course of the Debtor's business, including prepetition compensation (collectively, "Wage Obligations"). The total estimated amount of Wage Obligations that will have accrued, but remain unpaid, as of the Petition Date is $5,000.00.

32. The Debtor pays its Employees on a bi-weekly payroll cycle, the last pay period ended on July 18, 2015. Paychecks were last issued on July 23, 2015. The next payroll closes on August 1, 2015, meaning the Debtor will be required to issue paychecks to its Employees on August 6, 2015.

33. The Debtor is required by law to withhold from its Employees' wages amounts related to federal and state income taxes, as well as social security and Medicare taxes, and to remit these taxes to the appropriate taxing authorities. As the Debtor has deducted funds from the Employees' paychecks sufficient to pay these prepetition taxes, withholding taxes and FICA contributions attributable to Wage Obligations, which are due but have not been paid yet to any governmental entity, the Debtor seeks authorization to continue to deduct these funds and pay them to the appropriate governmental entities in the ordinary course of business.

34. Further, the Debtor is required to make matching payments from its own funds on account of social security and Medicare taxes, and to pay, based on a percentage of gross payroll, subject to state-imposed limits, additional amounts to taxing authorities for state and federal unemployment insurance, among additional amounts. The Debtor seeks authorization to continue to pay these funds in the ordinary course of business.

35. In the ordinary course of processing payroll checks for its Employees, the Debtor also withholds certain amounts for various garnishments, including tax levies, child and spousal support, payments, and student loans (collectively, "Garnishments"), which amounts have not been forwarded yet to the respective businesses and government agencies authorized to collect such funds. As of the Petition Date, the Debtor estimates the total Garnishments withheld at approximately $250.00. The Debtor requests permission to continue to pay over any withheld Garnishments in the ordinary course of its business operations.

36. Further, in the ordinary course of its business, Debtor has accrued amounts due for contributions to qualified retirement plans, health and benefit programs, and voluntary insurance plans, pertaining to services rendered by the Employees prior to the Petition Date (collectively, "Benefit Plans"). The Benefit Plans include: (i) health plans, such as medical, dental, vision, and life insurance; (ii) flexible spending accounts for healthcare and dependent care; (iii) various welfare plans, such as life insurance, disability insurance, accidental death and dismemberment insurance, long-term care and critical illness insurance; and (iv) other employee assistance programs. The Benefit Plan contributions ("Benefit Contributions") are a necessary component of the compensation to which the Employees are entitled. The amount of unpaid Benefit Contributions that will have accrued as of the Petition Date are estimated to be $3,250.00.

37. In the ordinary course of their employment, certain authorized Employees may expended their own funds or used their own credit cards on the Debtors behalf or benefit. ("Reimbursable Business Expenses"). The Debtor's Chapter 11 Case was filed during the Debtors' normal payroll periods for hourly and salaried Employees and during their normal reimbursement cycle for Reimbursable Business Expenses. The Debtor's Employees rendered services and incurred

Reimbursable Business Expenses in anticipation of receiving reimbursement of these Reimbursable Business Expenses. As of the Petition Date, certain Reimbursable Business Expenses may remain unreimbursed. The Debtor cannot provide a final statement of amount of Reimbursable Business Expenses that it may be responsible for as of the Petition Date. However, based upon the Debtor's prior business operations, would estimate that amount does not exceed $10,000.00. As reimbursement of the Reimbursable Business Expenses is required to ensure the continuation of the Debtor's business operations, as well as the retention of its Employees, the Debtor seeks authorization to pay such Reimbursable Business Expenses in the ordinary course of business.

38. Consistent with the requirements of Section 507(a)(4), the Wage Obligations and Employee Benefit Contributions to be paid to or for the benefit of each individual Employee will not exceed $12,475 per employee.

39. If the Debtor is not able to pay wages and taxes for the pay period commencing immediately prior to the Petition Date and concluding post-petition, there is a very significant risk that essential Employees will leave the Debtor's employ, and it is certain that those Employees that remain will be very discontented and demoralized, far from ideal for electricians performing often-hazardous tasks. Therefore, continued payment of Wage Obligations, Benefit Contributions, and Reimbursable Business Expenses is essential to maintain positive relations between the Debtor and its Employees. If the relief requested is not granted, it is anticipated that Employees will leave the Debtor in droves, leaving the Debtor unable to perform work on behalf of customers and almost immediately ending the Debtor's bankruptcy reorganization. Thus, the relief requested in the Debtor's payroll motion is in the best interests of the Debtor, and its bankruptcy estate, as well as in the best interests of creditors, the Employees, customers, and other parties in interest.

*D. Cash Management*

40. To manage its business in an efficient manner, the Debtor utilizes a centralized cash management system ("Cash Management System") to collect and transfer funds generated by its operations and disburse those funds to satisfy the ongoing obligations incurred in operating its business. The Cash Management System also facilitates the Debtor's cash monitoring, forecasting, and reporting.

The Debtor proposes to continue to utilize the Cash Management System to administer its bank accounts at the banks indicated herein.

41. In the ordinary course of business prior to filing the Case, the Debtor used the Cash Management System, which is similar to those utilized by other, similar companies, to collect, transfer, and distribute funds generated by the Debtor's business operations and in an efficient and secure manner. In the ordinary course of its business operations, the Debtor was able to utilize the cash management system to accurate record such collections, transfers, and distributions as they were made.

42. Currently, the Debtor has bank accounts with two different banks: Wells Fargo and Bank of Nevada. Prior to and through the Petition Date, most of the Debtor's banking activity was conducted through the Wells Fargo accounts.

43. Certain of the Debtor's customers use credit cards to make payments for services performed. Therefore, the Debtor has a merchant account through which payments made through credit card companies are processed. The Debtor is advised that it would take a substantial amount of time to obtain a new merchant account, resulting in the Debtor being unable to accept payment from customer wishing to pay via credit card. If the Debtor is not permitted to continue to use the merchant account as debtor-in-possession, it would no longer be able to offer its customers the option of paying via credit card during the interim time period until a new merchant account could be obtained. This absence of credit card services even for a short period of time would have a materially adverse effect on the Debtor's business.

44. As of the Petition Date, customer drafts relating to such credit cards were in various stages of collection. To obviate the disruption that might otherwise occur in the collection process, it is in the best interest of the estate for the Debtor to be authorized to continue to its ordinary course credit card transactions, rather than to close this account and then open a new account.

45. Given the complexity of the exiting Cash Management System and the confusion, inefficiency, and wasted manpower that would be caused by significant changes to the Cash Management System, the Debtor has determined it is best to continue its current cash management practices to a large extent.

46. The Debtor's Cash Management System constitutes ordinary course, essential business practices providing significant benefits to the Debtor including, the ability to (i) control corporate funds, (ii) ensure the availability of funds when necessary, and (iii) reduce costs and administrative expenses by facilitating the movement of funds and the development of more timely and accurate account balance information. Any disruption to the Cash Management System could have a severe and adverse impact upon the Debtor's bankruptcy reorganization.

47. The Debtor will maintain its books and records relating to the Cash Management System in the same manner such books and records were maintained before the Petition Date. In this way, all transfers and transactions will be properly documented, and accurate account balances will be maintained. As a result, the Debtor will be able to accurately document and record the transactions occurring within the Cash Management System for the benefit of all parties in interest.

48. Based on the foregoing, the Debtor submits that continuation of the existing Cash Management System is in the best interest of its bankruptcy estate and all parties in interest. As a result, the Debtor seeks authority to maintain and use its current Cash Management System during the pendency of its Chapter 11 Case.

49. Continuing the Cash Management System is vital to the efficient and economic administration of the Debtor's Chapter 11 Case. Therefore, it is within the Court's equitable power under Section 105(a) to approve the continued use of the Cash Management System, as modified herein.

50. In connection with their use of the Cash Management System, the Debtor incurs periodic service charges and other fees to its financial institutions for the maintenance of the Cash Management System ("Service Charges"). The Debtor is unaware of any unpaid prepetition Service Charges as of the Petition Date. Out of abundance of caution, the Debtor does request authority to pay any prepetition Service Charges that remain unpaid as of the Petition Date. Payment of the prepetition Services Charges is in the best interests of the Debtor, its bankruptcy estate, and all parties in interest, as payment of the Service Charges will prevent disruption to the Cash Management System. Because the Banks have setoff rights with respect to the Service Charges, payment of any prepetition Service Charges

would not affect unsecured creditors. As a result, through the cash management motion, the Debtor also seeks authority and sole discretion to pay any prepetition Service Charges.

51. The Debtor's Bank Accounts are maintained with financial institutions that have been approved by the U.S. Trustee as authorized bank depositories in this District. Further, it is possible that, at times, the Bank Accounts contain funds in excess of the amounts insured by the Federal Deposit Insurance Corporation ("FDIC"). To the extent funds in the Bank Accounts at various times may exceed the insurance provided by the FDIC, the Debtor submits such amounts will remain secure. Notably, the Banks are all highly rated and secure Banks with a federal or state charter and are subject to supervision and regulation by state and federal banking regulators. Furthermore, the Debtor will retain the right to remove funds held at the Banks.

52. If it becomes necessary for the Debtor to modify the Cash Management System, the Debtor requests authority to make such modifications to the Cash Management System as it deems appropriate under the circumstances. The Debtor anticipates that potential modifications to the Cash Management System may include, without limitation, the opening of new bank or investment accounts. The Debtor requests the Court authorize and direct financial institutions to honor the Debtor's request to open or close, as the case may be, the Bank Accounts or additional bank or investment accounts as may be necessary in connection with the foregoing.

53. As part of the Cash Management System, the Debtor maintains several Bank Accounts. The Debtor routinely deposits and withdraws funds from the Bank Accounts by checks, wire transfers, and automated clearinghouse transfers. With respect to the Debtor's standard business operations, rigid adherence to the U.S. Trustee's "Operating Guidelines and Reporting Requirements For Debtors in Possession and Trustees" (the "Guidelines") would require, as of the Petition Date, the closure of Debtor's prepetition bank accounts, the opening of new accounts, and the immediate printing of new checks with a "Debtor in Possession" designation on them. The Debtor asserts that its transition in its Chapter 11 Case will be more efficient, less costly, and more orderly, and disruption and harm to its Cash Management System will be minimized, if the Bank Accounts are continued following the

commencement of these cases with the same account numbers; provided, however, that checks issued or dated prior to the Petition Date will not be honored absent a prior order of the Court.

54. Unless otherwise ordered by this Court, no Bank shall honor or pay any check issued on account of a prepetition claim. The Banks may honor any checks issued on account of the prepetition claims only where this Court has specifically authorized such checks to be honored. Furthermore, notwithstanding anything to the contrary in any other emergency and interim order or other order of this Court, the Debtor request the Banks be authorized to accept and honor all representations from Debtors as to which checks should be honored or dishonored consistent with any order(s) of this Court, whether or not the checks are dated prior to, on, or subsequent to the Petition Date. The Banks shall not be liable to any party for following Debtor's instructions or representations regarding which checks should be honored or for implementing the transfer of funds between its Bank Accounts.

55. By preserving business continuity and avoiding disruption and delay with respect to the Debtor's disbursement obligations that would necessarily result from closing the Bank Accounts and opening new accounts, all parties in interest, including employees, vendors, and customers, will be best-served. The confusion that would otherwise result, absent the relief requested herein, would be a significant detriment to the Debtor's reorganization efforts.

56. Accordingly, the Debtor respectfully requests authority to maintain the Bank Accounts in the ordinary course of business, to continue utilizing the Cash Management System to manage cash in a manner consistent with prepetition practices, and to pay any ordinary course bank fees that may be incurred in connection with the Bank Accounts or any other new bank account that may be opened pursuant to an order of this Court following the Petition Date.

57. To minimize avoidable business expenses, the Debtor further requests it be allowed to continue to use its correspondence and business forms, including, but not limited to, purchase orders, multi-copy checks, letterhead, envelopes, promotional materials, and other business forms (collectively, "Business Forms"), substantially in the forms existing immediately before the Petition Date, without reference to their status as a debtor in possession. The Debtor further requests it be allowed to continue using its check stock to make authorized payroll and vendor payments, provided

that the Debtors will commence marking a "Debtor in Possession" designation and the case number for the Chapter 11 Case on its existing check stock and wire transfer instructions, in lieu of purchasing new check stock.

58.  If the Debtor is not allowed to maintain and utilize its current Bank Accounts and its existing Business Forms, including check stock, the Debtor will suffer harm that will include significant: (i) disruption to the Debtor's ordinary financial affairs and business operations; (ii) delay and needless complication in the administration of Debtor's estate; and (iii) significant cost to the Debtor's bankruptcy estate to set up new systems, open new accounts, print new business forms, and print new checks.

I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.

Executed on this 30 day of July, 2015.

_____
BRIAN N. GECZI